JUDGE COTE UNITED STATES DISTRICT COURT 08 CIV 6065
FOR THE SOUTHERN DISTRICT OF NEW YORK

STERN/LEACH COMPANY,

       Plaintiff

       v.

ALMOND INTERNATIONAL, INC., ALMOND
STERLING, INC., ALMOND (THAILAND)
LIMITED, GOLD AND HONEY (1995) LP, GOLD &
HONEY, LTD., JONATHAN MANDELBAUM, and
MAURICE MANDELBAUM,

       Defendants.

         C.A. No. 08-_____

## COMPLAINT

Plaintiff Stern/Leach Company ("Stern/Leach"), for its Complaint against

Defendants Almond International, Inc. ("Almond International"), Almond Sterling, Inc.

("Almond Sterling"), Almond (Thailand) Limited ("Almond Thailand"), Gold and Honey

(1995) LP ("Gold & Honey 1995"), Gold & Honey, Ltd. ("Gold & Honey"), Jonathan

Mandelbaum and Maurice Mandelbaum (collectively, "Defendants"), states as follows:

### PARTIES

1.     Plaintiff Stern/Leach is a corporation duly organized and existing under

the laws of the State of Delaware, with its principle place of business located in

Attleboro, Massachusetts.

2.     Upon information and belief, Defendant Almond International is a

corporation duly organized and existing under the laws of the State of New York.

3.     Upon information and belief, Defendant Almond Sterling is a corporation

duly organized and existing under the laws of the State of New York.

4.    Upon information and belief, Defendant Almond Thailand is a corporation duly organized and existing under the laws of the Kingdom of Thailand.

5.    Upon information and belief, Defendant Gold & Honey 1995 is a limited partnership duly organized and existing under the laws of the State of New York.

6.    Upon information and belief, Defendant Gold & Honey is a corporation duly organized and existing under the laws of the State of Israel.

7.    Upon information and belief, Defendant Jonathan Mandelbaum and Defendant Maurice Mandelbaum (together, the "Mandelbaums") are citizens of the State of New York.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because (a) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and (b) the action is between citizens of different States and in which citizens or subjects of foreign states are additional parties.

9.    Venue is appropriate in this Court because (a) this Court is a venue to which Stern/Leach and Defendants have agreed pursuant to written agreement (discussed below); and (b) pursuant to 28 U.S.C. § 1391, all Defendants are subject to personal jurisdiction in this Court.

## FACTS

10.    On or about August 30, 1999, Stern/Leach entered into the Agreement for Strategic Alliance (the "Strategic Alliance Agreement") with, inter alia, Almond International, Almond Sterling, Almond Thailand, Gold & Honey 1995 and Gold & Honey (collectively, the "Companies").

11.     On or about August 30, 1999 and pursuant to the Strategic Alliance Agreement, Stern/Leach loaned the sum of seven hundred thousand and 00/100 dollars ($700,000.00) to the Companies, as evidenced by a promissory note  that the Companies executed in favor of Stern/Leach in that amount on that date (the "New Loan Note").  A true, genuine and accurate copy of the New Loan Note is attached hereto as Exhibit A.

12.     On or about August 30, 1999 and pursuant to the Strategic Alliance Agreement, Stern/Leach and the Companies restructured three million three hundred thousand and 00/100 dollars ($3,300,000.00) of the Companies' outstanding trade debt to Stern/Leach for the purpose of making that trade debt payable upon the same terms and conditions as the New Loan Note, as evidenced by a promissory note that the Companies executed in favor of Stern/Leach in that amount on that date (the "Trade Debt Note").  A true, genuine and accurate copy of the Trade Debt Note is attached hereto as Exhibit B.

13.     On or about August 30, 1999 and pursuant to the Strategic Alliance Agreement, Stern/Leach loaned the sum of two million and 00/100 dollars ($2,000,000.00) to the Mandelbaums, as evidenced by a promissory note that the Mandelbaums executed in favor of Stern/Leach in that amount on that date (the "Personal Loan Note").  A true, genuine and accurate copy of the Personal Loan Note is attached hereto as Exhibit C.

14.     Under each of the New Loan Note, the Trade Debt Note and the Personal Loan Note (collectively, the "Notes"), (a) the full amount of the principal would become due and owing as of the applicable maturity date specified in the Strategic Alliance Agreement; and (b) no periodic payments of principal were required prior to maturity.

See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1; see also Strategic Alliance Agreement at §§ 1.2, 1.9.

15.     Under each of the New Loan Note and the Trade Debt Note, (a) interest would accrue, if at all, only for the period January 1, 2003 through December 31, 2003, and only if the applicable maturity date ultimately turned out to be December 31, 2003; (b) the full amount of any accrued interest would become due and owing as of December 31, 2003; and (c) no periodic payments of interest were required prior to maturity.  See Exhibit A at 1; Exhibit B at 1; see also Strategic Alliance Agreement at § 1.2.

16.     Under the Personal Loan Note, interest accrued, for the entire term of the Personal Loan Note, at the fluctuating prime rate per annum as reported from time to time in the Wall Street Journal.  The full amount of the accrued interest would become due and owing as of the maturity date of the Personal Loan Note specified in the Strategic Alliance Agreement; no periodic payments of interest were required prior to maturity. See Exhibit C at 1; see also Strategic Alliance Agreement at §§ 1.2, 1.9.

17.     Each of the Notes provides that it "is not subject to set off for any amounts for any reason."  See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1.

18.     Under the terms of each of the Notes, the Companies and the Mandelbaums "expressly waive presentment, demand, notice of demand, protest, notice of protest and notice of nonpayment and any other notice required to be given under the law to the undersigned in connection with the delivery, acceptance, performance, default or enforcement of this Note." See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1.

19.     Under the terms of each of the Notes, an Event of Default would include, inter alia, any "failure on the part of the undersigned to pay any installment of principal or interest under this Note as and when due." See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1.

20.     Each of the Notes provides as follows: "Upon the occurrence of an Event of Default, the entire balance outstanding hereunder shall, at the option of the holder hereof [Stern/Leach], become forthwith due and payable, without presentment, notice, protest or demand of any kind (all of which are expressly waived by the undersigned) for the payment of the whole or any part hereof. Failure at any time to exercise any of the aforesaid options or any other rights of Lender [Stern/Leach] hereunder shall not constitute a waiver thereof, nor shall it be a bar to exercise of any of the aforesaid options or rights at a later date." See Exhibit A at 1; Exhibit B at 1; Exhibit C at 2-3.

21.     On or about August 30, 1999 and pursuant to the Strategic Alliance Agreement, the Mandelbaums executed and delivered to Stern/Leach their joint and several personal guaranty (the "Guaranty") of the Companies' "prompt payment and performance" of "all of the obligations of the Companies under" the New Loan Note and the Trade Debt Note, up to an aggregate amount of four million twenty-five thousand and 00/100 dollars ($4,025,000.00). A true, genuine and accurate copy of the Guaranty is attached hereto as Exhibit D.

22.     Under the terms of the Guaranty, the Mandelbaums (a) "waive[] demand, presentment, protest, notice of any kind and all suretyship defenses generally"; and (b) "agree[] that the liability of Guarantor [the Mandelbaums] hereunder is primary, direct and unconditional and may be enforced without requiring Lender [Stern/Leach] first to

resort to any other person (including, without limitation, the Companies or any of them), right, remedy or collateral." See Exhibit D.

23.     Under the terms of each of the Notes, the Guaranty and the Strategic Alliance Agreement, the Companies and the Mandelbaums, jointly and severally, agree to pay all of Stern/Leach's costs and expenses of collection of the Notes and/or the Guaranty, including, without limitation, reasonable attorney's fees, up to an aggregate amount of twenty-five thousand and 00/100 dollars ($25,000.00). See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1; Exhibit D; Strategic Alliance Agreement at § 1.12.

24.     Under Section 12.16 of the Strategic Alliance Agreement, any dispute arising under any of the Notes and/or the Guaranty must be brought in a federal or state court in the State of New York, and each of the Companies, the Mandelbaums and Stern/Leach submits to the jurisdiction of, and consents to the appropriateness of venue in, such courts.

25.     On or about January 29, 2003, prior to the maturity of any of the Notes, Stern/Leach entered into an agreement (the "Debt Restructuring Agreement") with, inter alia, the Companies and the Mandelbaums. A true, genuine and accurate copy of the Debt Restructuring Agreement is attached hereto as Exhibit E.

26.     Under Section 2 of the Debt Restructuring Agreement, the Notes were amended to provide, inter alia, that the combined outstanding balances of principal ($6,000,000.00) and accrued interest thereon ($500,000.00), in the total amount of $6,500,000.00, would be repaid in accordance with the new repayment schedule attached as Exhibit A to the Debt Restructuring Agreement, together with interest thereon from

January 1, 2003 until the Notes were paid in full, at the fluctuating prime rate per annum as reported from time to time in the <u>Wall Street Journal</u> plus one percent (1.00%).

  27. Pursuant to the Debt Restructuring Agreement, the principal amounts of each of the Notes (as amended by the Debt Restructuring Agreement) were the following: (a) New Loan Note ($758,500.00); (b) Trade Debt Note ($3,575,000.00); and (c) Personal Loan Note ($2,166,500.00) (for a total principal amount of $6,500,000.00).

  28. Under Section 2 of the Debt Restructuring Agreement, interest was payable contemporaneously with each payment of principal.

  29. Section 2 of the Debt Restructuring Agreement provides as follows: "With the exception of the new repayment schedule, all of the other original terms and conditions of the Notes will continue to apply and are hereby confirmed."

  30. Section 2(e) of the Debt Restructuring Agreement states as follows: "Any and all payments, prepayment or deemed discharges of the Notes occurring after the date hereof shall be applied among the New Loan Note, the Trade Debt Note and the Personal Loan Note as you shall designate in advance of payment or discharge or, in default of your timely designation, ratably among the Notes; and any payment, prepayment or deemed discharge against any Note shall be applied against regularly scheduled installments of principal in the inverse order of their maturity."

  31. In 2003, all of the payments of principal and interest that were required under the Notes (as amended by the Debt Restructuring Agreement) were made. Pursuant to the terms of the Notes (as amended by the Debt Restructuring Agreement), these payments were applied ratably among the three Notes.

7

32.    In 2003, pursuant to Section 2(c) of the Debt Restructuring Agreement, the Companies provided Stern/Leach certain labor/fabrication services that had a value of three hundred seventy-eight thousand nine hundred thirty-nine and 00/100 dollars ($378,939.00) (the "Services Credit").

33.    Stern/Leach applied the full amount of the Services Credit to the principal balance under the Notes (as amended by the Debt Restructuring Agreement). Pursuant to the terms of the Notes (as amended by the Debt Restructuring Agreement), the full amount of the Services Credit was applied ratably among the three Notes.

34.    In 2004, all of the payments of principal and interest that were required under the Notes (as amended by the Debt Restructuring Agreement) were made. Pursuant to the terms of the Notes (as amended by the Debt Restructuring Agreement), these payments were applied ratably among the three Notes.

35.    In 2005, none of the payments of principal or interest that were required under the Notes (as amended by the Debt Restructuring Agreement) were made.

36.    In 2005, neither of the Mandelbaums made any payments to Stern/Leach pursuant to the Guaranty.

37.    On or about February 17, 2006, a payment of sixty thousand dollars ($60,000.00) was made toward the Notes (as amended by the Debt Restructuring Agreement). Stern/Leach applied this payment to the principal balance under the Notes (as amended by the Debt Restructuring Agreement). Pursuant to the terms of the Notes (as amended by the Debt Restructuring Agreement), this payment was applied ratably among the three Notes.

38.    After February 17, 2006, neither the Companies nor the Mandelbaums made any payments of principal or interest toward the Notes (as amended by the Debt Restructuring Agreement).

39.    Neither of the Mandelbaums ever made any payments to Stern/Leach pursuant to the Guaranty.

40.    As of May 29, 2008, the principal balance under the Notes (as amended by the Restructuring Agreement) was four million six hundred twenty-one thousand sixty-one and 00/100 dollars ($4,621,061.00).

41.    As of May 29, 2008, the accrued interest under the Notes (as amended by the Restructuring Agreement) was one million three hundred three thousand nine hundred seventy-four and 00/100 dollars ($1,303,974.00).

42.    On or about May 29, 2008, the Companies transferred to Stern/Leach one thousand five hundred (1,500.00) ounces of gold, with a value of one million three hundred twenty-two thousand five hundred twenty-two and 00/100 dollars ($1,322,522.00) (the "Gold Credit").

43.    Stern/Leach applied the full amount of the Gold Credit to amounts due and owing under the Notes (as amended by the Debt Restructuring Agreement). Stern/Leach applied one million three hundred three thousand nine hundred seventy-four and 00/100 dollars ($1,303,974.00) of the Gold Credit to accrued interest under the Notes (as amended by the Debt Restructuring Agreement). Stern Leach applied the balance of the Gold Credit (eighteen thousand five hundred forty-eight and 00/100 dollars ($18,548.00)) to the principal balance under the Notes (as amended by the Debt Restructuring Agreement). Pursuant to the terms of the Notes (as amended by the Debt Restructuring

Agreement), the balance of the Gold Credit ($18,548.00) was applied ratably among the three Notes.

44.    Each failure to make a payment as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, each of the Notes (as amended by the Debt Restructuring Agreement).

45.    The entire balance outstanding under each of the Notes (as amended by the Debt Restructuring Agreement) is due and payable.

46.    As of May 30, 2008, the principal balance due and owing under the Notes (as amended by the Debt Restructuring Agreement) was four million six hundred two thousand five hundred thirteen and 00/100 dollars ($4,602,513.00).  From May 30, 2008 until the Notes (as amended by the Debt Restructuring Agreement) are paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $756.58 per diem.

47.    As of May 30, 2008, the principal balances due and owing under each of the Notes (as amended by the Debt Restructuring Agreement) were the following:  (a) $537,126.00 under the New Loan Note; (b) $2,531,382.00 under the Trade Debt Note; and (c) $1,534,005.00 under the Personal Loan Note.  From May 30, 2008 until the Notes (as amended by the Debt Restructuring Agreement) are paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%).  The per diem interest rates under each of the Notes (as amended by the Debt Restructuring Agreement) are the following:  (a) New Loan Note ($88.29); (b) Trade Debt Note ($416.12); and (c) Personal Loan Note ($252.17).

## COUNT I

## BREACH OF CONTRACT FOR NONPAYMENT UNDER NEW LOAN NOTE

### (Companies)

48.     Stern/Leach incorporates by reference paragraphs 1 through 47 above, inclusive, as though fully set forth herein.

49.     Pursuant to the terms of the New Loan Note (as amended by the Debt Restructuring Agreement), (a) Stern/Leach promised and agreed, inter alia, to loan to the Companies the sum of seven hundred fifty-eight thousand five hundred and 00/100 dollars ($758,500.00); and (b) the Companies promised and agreed, inter alia, to repay to Stern Leach the sum of seven hundred fifty-eight thousand five hundred and 00/100 dollars ($758,500.00), plus interest as set forth in the Debt Restructuring Agreement.

50.     The Companies executed and delivered to Stern/Leach the New Loan Note and the Debt Restructuring Agreement.

51.     Pursuant to the terms of the New Loan Note (as amended by the Debt Restructuring Agreement), Stern/Leach loaned to the Companies the sum of seven hundred fifty-eight thousand five hundred and 00/100 dollars ($758,500.00).

52.     Each failure to make a payment as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, the New Loan Note (as amended by the Debt Restructuring Agreement).

53.     The entire balance outstanding under the New Loan Note (as amended by the Debt Restructuring Agreement) is due and payable.

54.     As of May 30, 2008, the principal balance due and owing under the New Loan Note (as amended by the Debt Restructuring Agreement) was five hundred thirty-seven thousand one hundred twenty-six and 00/100 dollars ($537,126.00).

55.     From May 30, 2008 until the New Loan Note (as amended by the Debt Restructuring Agreement) is paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $88.29 per diem.

56.     The Companies' failure to make the payments required under the repayment schedule of the Debt Restructuring Agreement as and when due has injured Stern/Leach.

## COUNT II

## BREACH OF CONTRACT FOR NONPAYMENT UNDER TRADE DEBT NOTE

### (Companies)

57.     Stern/Leach incorporates by reference paragraphs 1 through 56 above, inclusive, as though fully set forth herein.

58.     Pursuant to the terms of the Trade Debt Note (as amended by the Debt Restructuring Agreement), (a) Stern/Leach promised and agreed, inter alia, to restructure three million five hundred seventy-five thousand and 00/100 dollars ($3,575,000.00) of the Companies' trade indebtedness to Stern/Leach; and (b) the Companies promised and agreed, inter alia, to repay to Stern Leach the sum of three million five hundred seventy-five thousand and 00/100 dollars ($3,575,000.00), plus interest as set forth in the Debt Restructuring Agreement.

59.     The Companies executed and delivered to Stern/Leach the Trade Debt Note and the Debt Restructuring Agreement.

60.     Pursuant to the terms of the Trade Debt Note (as amended by the Debt Restructuring Agreement), Stern/Leach restructured three million five hundred seventy-five thousand and 00/100 dollars ($3,575,000.00) of the Companies' trade indebtedness to Stern/Leach.

61.     Each failure to make a payment as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, the Trade Debt Note (as amended by the Debt Restructuring Agreement).

62.     The entire balance outstanding under the Trade Debt Note (as amended by the Debt Restructuring Agreement) is due and payable.

63.     As of May 30, 2008, the principal balance due and owing under the Trade Debt Note (as amended by the Debt Restructuring Agreement) was two million five hundred thirty-one thousand three hundred eighty-two and 00/100 dollars ($2,531,382.00).

64.     From May 30, 2008 until the Trade Debt Note (as amended by the Debt Restructuring Agreement) is paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $416.12 per diem.

65.     The Companies' failure to make the payments required under the repayment schedule of the Debt Restructuring Agreement as and when due has injured Stern/Leach.

## COUNT III

### BREACH OF CONTRACT FOR NONPAYMENT UNDER PERSONAL LOAN NOTE

### (Mandelbaums)

66.     Stern/Leach incorporates by reference paragraphs 1 through 65 above, inclusive, as though fully set forth herein.

67.     Pursuant to the terms of the Personal Loan Note (as amended by the Debt Restructuring Agreement), (a) Stern/Leach promised and agreed, inter alia, to loan to the Mandelbaums the sum of two million one hundred sixty-six thousand five hundred and 00/100 dollars ($2,166,500.00); and (b) the Mandelbaums promised and agreed, inter alia, to repay to Stern Leach the sum of two million one hundred sixty-six thousand five hundred and 00/100 dollars ($2,166,500.00), plus interest as set forth in the Debt Restructuring Agreement.

68.     The Mandelbaums executed and delivered to Stern/Leach the Personal Loan Note and the Debt Restructuring Agreement.

69.     Pursuant to the terms of the Personal Loan Note (as amended by the Debt Restructuring Agreement), Stern/Leach loaned to the Mandelbaums the sum of two million one hundred sixty-six thousand five hundred and 00/100 dollars ($2,166,500.00).

70.     Each failure to make a payment as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, the Personal Loan Note (as amended by the Debt Restructuring Agreement).

71.     The entire balance outstanding under the Personal Loan Note (as amended by the Debt Restructuring Agreement) is due and payable.

72.    As of May 30, 2008, the principal balance due and owing under the Personal Loan Note (as amended by the Debt Restructuring Agreement) was one million five hundred thirty-four thousand five and 00/100 dollars ($1,534,005.00).

73.    From May 30, 2008 until the Personal Loan Note (as amended by the Debt Restructuring Agreement) is paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $252.17 per diem.

74.    The Mandelbaums' failure to make the payments required under the repayment schedule of the Debt Restructuring Agreement as and when due has injured Stern/Leach.

<u>COUNT IV</u>

<u>BREACH OF CONTRACT FOR NONPAYMENT UNDER GUARANTY</u>

**(Mandelbaums)**

75.    Stern/Leach incorporates by reference paragraphs 1 through 74 above, inclusive, as though fully set forth herein.

76.    Pursuant to the terms of the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement) and the terms of the Guaranty, (a) Stern/Leach promised and agreed, <u>inter alia</u>, to loan amounts to the Companies and to restructure indebtedness of the Companies aggregating the sum of four million three hundred thirty-three thousand five hundred and 00/100 dollars ($4,333,500.00); (b) the Companies promised and agreed, <u>inter alia</u>, to repay to Stern Leach the sum of four million three hundred thirty-three thousand five hundred and 00/100 dollars ($4,333,500.00), plus interest as set forth in the Debt Restructuring Agreement; and (c) the Mandelbaums promised and agreed, <u>inter alia</u>, to jointly and severally personally

guarantee the Companies' "prompt payment and performance" of "all of the obligations of the Companies under" the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement), up to an aggregate amount of four million twenty-five thousand and 00/100 dollars ($4,025,000.00).

77.     The Companies executed and delivered to Stern/Leach the New Loan Note, the Trade Debt Note and the Debt Restructuring Agreement.

78.     The Mandelbaums executed and delivered to Stern/Leach the Guaranty and the Debt Restructuring Agreement.

79.     Pursuant to the terms of the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement) and the terms of the Guaranty, Stern/Leach loaned amounts to the Companies and restructured indebtedness of the Companies aggregating the sum of four million three hundred thirty-three thousand five hundred and 00/100 dollars ($4,333,500.00).

80.     Each failure to make a payment as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, each of the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement).

81.     Neither of the Mandelbaums made any payments to Stern/Leach pursuant to the Guaranty.

82.     Each failure of the Mandelbaums to make payment to Stern/Leach under the Guaranty for the amount of the payment that the Companies failed to make as and when due as required under the repayment schedule of the Debt Restructuring Agreement constitutes a separate event of default under, and a separate breach of, the Guaranty.

83.    The entire balances outstanding under each of the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement) are due and payable.

84.    As of May 30, 2008, the principal balance due and owing under the New Loan Note (as amended by the Debt Restructuring Agreement) was $537,126.00, and the principal balance due and owing under the Trade Debt Note (as amended by the Debt Restructuring Agreement) was $2,531,382.00, for a total of $3,068,508.00.

85.    From May 30, 2008 until the New Loan Note (as amended by the Debt Restructuring Agreement) is paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $88.29 per diem.  From May 30, 2008 until the Trade Debt Note (as amended by the Debt Restructuring Agreement) is paid in full, interest continues to accrue at the annual rate of prime plus one percent (1.00%), or $416.12 per diem.  The total per diem interest rate for the New Loan Note and the Trade Debt Note is $504.41.

86.    The Mandelbaums' failure to make payment under the Guaranty for the amounts due and owing under the New Loan Note and the Trade Debt Note (each as amended by the Debt Restructuring Agreement) has injured Stern/Leach.

WHEREFORE, Stern/Leach respectfully requests that this Court:

a.   enter judgment in favor of Stern/Leach and against the Companies for the Companies' breach of the New Loan Note (as amended by the Restructuring Agreement);

b.   award Stern/Leach the sum of $537,126.00, plus interest from May 30, 2008 at the annual rate of prime plus one percent (1.00%), for the Companies' breach of the New Loan Note (as amended by the Restructuring Agreement);

c.   enter judgment in favor of Stern/Leach and against the Companies for the Companies' breach of the Trade Debt Note (as amended by the Restructuring Agreement);

d.   award Stern/Leach the sum of $2,531,382.00, plus interest from May 30, 2008 at the annual rate of prime plus one percent (1.00%), for the Companies' breach of the Trade Debt Note (as amended by the Restructuring Agreement);

e.   enter judgment in favor of Stern/Leach and against the Mandelbaums for the Mandelbaums' breach of the Personal Loan Note (as amended by the Debt Restructuring Agreement);

f.   award Stern/Leach the sum of $1,534,005.00, plus interest from May 30, 2008 at the annual rate of prime plus one percent (1.00%), for the Mandelbaums' breach of the Personal Loan Note (as amended by the Debt Restructuring Agreement);

g.   enter judgment in favor of Stern/Leach and against the Mandelbaums for the Mandelbaums' breach of the Guaranty;

h.   award Stern/Leach the sum of $3,068,508.00, plus interest from May 30, 2008 at the annual rate of prime plus one percent (1.00%), for the Mandelbaums' breach of the Guaranty;

i.   award Stern/Leach its costs, expenses and reasonable attorneys' fees; and

j.   award Stern/Leach such other and further relief as this Court deems just and proper.

**STERN/LEACH COMPANY DEMANDS**
**TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

STERN/LEACH COMPANY
By its Attorneys:

GEOFFREY W. MILLSOM (GM 7678)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel:  (401) 274-7200
Fax:  (401) 751-0604
Dated:  July 1, 2008


Of Counsel:

JOSEPH AVANZATO
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel:  (401) 274-7200
Fax:  (401) 751-0604

*457557_1.doc*

# EXHIBIT A

# NEW LOAN NOTE

**COPY**

US $700,000                                August 30, 1999

FOR VALUE RECEIVED, the undersigned, jointly and severally, unconditionally promise to pay to Stern/Leach Company ("Lender"), or order, the principal sum of SEVEN HUNDRED THOUSAND UNITED STATES DOLLARS (US $700,000). This Note shall be without interest, except as provided for in Section 1.2 of a certain Agreement for Strategic Alliance of even date hereof (the "Agreement") among the undersigned, the shareholders and partners of the undersigned and Lender.

The entire principal balance of this Note (together with any interest accrued thereon) shall be paid in one lump sum on the New Loan Note Maturity Date (as defined in Section 1.2 of the Agreement).

This Note is secured by a collateral assignment of the Key Man Life Insurance Policies (as defined in the Agreement) and by a pledge of shares and partnership interests in the undersigned.

This Note may be prepaid in whole or in part at any time and from time to time without premium or penalty. This Note is subject to the mandatory prepayment or discharge thereof as and to the extent provided for in Sections 1.6 and 1.8 of the Agreement and must be prepaid upon the death of either of Jonathan Mandelbaum or Maurice Mandelbaum to the extent of any death benefit received by any of the undersigned pursuant to any of the Key Man Life Insurance Policies (as defined in the Agreement).

This Note is not subject to set off for any amounts for any reason.

The undersigned, jointly and severally, for themselves and their successors and assigns, hereby expressly waive presentment, demand, notice of demand, protest, notice of protest and notice of nonpayment and any other notice required to be given under the law to the undersigned in connection with the delivery, acceptance, performance, default or enforcement of this Note. The undersigned, jointly and severally, further agree to pay, on demand, all costs and expenses of collection of this Note, including, without limitation, reasonable attorneys fees, subject to Section 1.12 of the Agreement.

Any of the following shall constitute an Event of Default under this Note: (i) failure on the part of the undersigned to pay any installment of principal or interest under this Note as and when due; (ii) any breach or default in the payment or performance of any obligations, liabilities or agreements of the undersigned (or the shareholders and partners of the undersigned) to Lender or any of Lender's affiliates under the Agreement, or the breach of any of the representations and warranties made by the undersigned (or the shareholders and partners of the undersigned) in the Agreement; (iii) the filing or commencement of a proceeding against any of the undersigned for dissolution or liquidation (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof) or

1

the voluntary or involuntary termination or dissolution of any of the undersigned; (iv) any of the undersigned is enjoined, restrained or in any way prevented by court order from conducting all or a material portion of its business affairs; (v) any of the undersigned becomes insolvent or the subject of any bankruptcy or similar proceeding (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof), or the business failure of, the appointment of (or taking possession by) a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for (or for any of the property of) any of the undersigned or an assignment for the benefit of creditors by the undersigned or failure by any of the undersigned generally to pay its debts as and when due; (vi) any of the undersigned suffers or permits any event or condition, whether or not occurring in the ordinary course of business, which event or condition by itself or in conjunction with any or all other such events or conditions, has or will have a material adverse effect on the condition (financial or otherwise), properties, assets, liabilities, business, operations, affairs or prospects of the undersigned; or (vii) any of the undersigned furnishes to Lender financial statements which are required to be furnished to Lender pursuant to Section 2.1 (d) of the Agreement and which are accompanied by a qualified opinion of the auditors for the undersigned. Notwithstanding the foregoing: (A) a breach or default under any of clauses (a) through (g) or (l), (m) or (q) of Section 2.1 of the Agreement which is the first of its kind to occur in any 12 consecutive month period shall <u>not</u> constitute an Event of Default hereunder unless such breach or default remains uncured 30 days after written notice thereof is given by Lender to the Owners' Representative, (B) a breach of the representations and warranties made by the undersigned (or the shareholders and partners of the undersigned) in Sections 4.2 (second sentence) and 4.7 of the Agreement or in Exhibit H (Sections 1 through 30 thereof) of the Agreement shall <u>not</u> constitute an Event of Default under this Note unless such breach is material, (C) a breach by the undersigned of their obligations under Section 3.2 of the Agreement shall not constitute an Event of Default under this Note unless a breach thereof occurs in connection with more than 15% of all Products sold by the undersigned to Lender in any calendar quarter or more than 15% of all Products sold by the undersigned to Lender in any calendar year, (D) a breach by the undersigned of their obligations under Section 3.1 of the Agreement shall not constitute an Event of Default under this Note unless the undersigned fail to fill more than 15% of Lender's orders which are required to be filled under Section 3.1 in any calendar year and (E) neither the personal bankruptcy of Jonathan Mandelbaum or Maurice Mandelbaum nor their inability to repay the Personal Loan upon any acceleration thereof, resulting from his bankruptcy will, in and of itself, constitute an Event of Default under this Note.

Upon the occurrence of an Event of Default, the entire balance outstanding hereunder shall, at the option of the holder hereof, become forthwith due and payable, without presentment, notice, protest or demand of any kind (all of which are expressly waived by the undersigned) for the payment of the whole or any part hereof. Failure at any time to exercise any of the aforesaid options or any other rights of Lender hereunder shall not constitute a waiver thereof, nor shall it be a bar to exercise of any of the aforesaid options or rights at a later date.

2

As used herein, the term "Lender" shall include Lender and Lender's successors, endorsees and assigns.

ALMOND INTERNATIONAL, INC.

By: _____
Name: JONATHAN MANDELBAUM
Title: CHAIRMAN

ALMOND STERLING, INC.

By: _____
Name: MAURICE MANDELBAUM
Title: PRESIDENT

ALMOND (THAILAND) LIMITED

By: _____
Name: MAURICE MANDELBAUM
Title: DIRECTOR

GOLD AND HONEY (1995) LP
By: ALMOND JEWELERS, INC.

By: _____
Name: JONATHAN MANDELBAUM
Title: ~~Partner~~ President

GOLD & HONEY, LTD.

By: _____
Name: JONATHAN MANDELBAUM
Title: CHAIRMAN

*f:\apsdocs\docsam\cookeng\hoops\loannote.doc*

3

# EXHIBIT B

# COPY

## TRADE DEBT NOTE

US $3,300,000                                    August 30, 1999

FOR VALUE RECEIVED, the undersigned, jointly and severally, unconditionally promise to pay to Stern/Leach Company ("Lender"), or order, the principal sum of THREE MILLION THREE HUNDRED THOUSAND UNITED STATES DOLLARS (US $3,300,000). This Note shall be without interest, except as provided for in Section 1.2 of a certain Agreement for Strategic Alliance of even date hereof (the "Agreement") among the undersigned, the shareholders and partners of the undersigned and Lender.

The entire principal balance of this Note (together with any interest accrued thereon) shall be paid in one lump sum on the New Loan Note Maturity Date (as defined in Section 1.2 of the Agreement).

This Note is secured by a collateral assignment of the Key Man Life Insurance Policies (as defined in the Agreement) and by a pledge of shares and partnership interests in the undersigned.

This Note may be prepaid in whole or in part at any time and from time to time without premium or penalty. This Note is subject to the mandatory prepayment or discharge thereof as and to the extent provided for in Sections 1.6 and 1.8 of the Agreement and must be prepaid upon the death of either of Jonathan Mandelbaum or Maurice Mandelbaum to the extent of any death benefit received by any of the undersigned pursuant to any of the Key Man Life Insurance Policies (as defined in the Agreement).

This Note is not subject to set off for any amounts for any reason.

The undersigned, jointly and severally, for themselves and their successors and assigns, hereby expressly waive presentment, demand, notice of demand, protest, notice of protest and notice of nonpayment and any other notice required to be given under the law to the undersigned in connection with the delivery, acceptance, performance, default or enforcement of this Note. The undersigned, jointly and severally, further agree to pay, on demand, all costs and expenses of collection of this Note, including, without limitation, reasonable attorneys fees, subject to Section 1.12 of the Agreement.

Any of the following shall constitute an Event of Default under this Note: (i) failure on the part of the undersigned to pay any installment of principal or interest under this Note as and when due; (ii) any breach or default in the payment or performance of any obligations, liabilities or agreements of the undersigned (or the shareholders and partners of the undersigned) to Lender or any of Lender's affiliates under the Agreement, or the breach of any of the representations and warranties made by the undersigned (or the shareholders and partners of the undersigned) in the Agreement; (iii) the filing or commencement of a proceeding against any of the undersigned for dissolution or liquidation (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof) or

1

the voluntary or involuntary termination or dissolution of any of the undersigned; (iv) any of the undersigned is enjoined, restrained or in any way prevented by court order from conducting all or a material portion of its business affairs; (v) any of the undersigned becomes insolvent or the subject of any bankruptcy or similar proceeding (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof), or the business failure of, the appointment of (or taking possession by) a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for (or for any of the property of) any of the undersigned or an assignment for the benefit of creditors by the undersigned or failure by any of the undersigned generally to pay its debts as and when due; (vi) any of the undersigned suffers or permits any event or condition, whether or not occurring in the ordinary course of business, which event or condition by itself or in conjunction with any or all other such events or conditions, has or will have a material adverse effect on the condition (financial or otherwise), properties, assets, liabilities, business, operations, affairs or prospects of the undersigned; or (vii) any of the undersigned furnishes to Lender financial statements which are required to be furnished to Lender pursuant to Section 2.1 (d) of the Agreement and which are accompanied by a qualified opinion of the auditors for the undersigned. Notwithstanding the foregoing:  (A) a breach or default under any of clauses (a) through (g) or (l), (m) or (q) of Section 2.1 of the Agreement which is the first of its kind to occur in any 12 consecutive month period shall <u>not</u> constitute an Event of Default hereunder unless such breach or default remains uncured 30 days after written notice thereof is given by Lender to the Owners' Representative, (B) a breach of the representations and warranties made by the undersigned (or the shareholders and partners of the undersigned) in Sections 4.2 (second sentence) and 4.7 of the Agreement or in Exhibit H (Sections 1 through 30 thereof) of the Agreement shall <u>not</u> constitute an Event of Default under this Note unless such breach is material, (C) a breach by the undersigned of their obligations under Section 3.2 of the Agreement shall not constitute an Event of Default under this Note unless a breach thereof occurs in connection with more than 15% of all Products sold by the undersigned to Lender in any calendar quarter or more than 15% of all Products sold by the undersigned to Lender in any calendar year, (D) a breach by the undersigned of their obligations under Section 3.1 of the Agreement shall not constitute an Event of Default under this Note unless the undersigned fail to fill more than 15% of Lender's orders which are required to be filled under Section 3.1 in any calendar year and (E) neither the personal bankruptcy of Jonathan Mandelbaum or Maurice Mandelbaum nor their inability to repay the Personal Loan upon any acceleration thereof, resulting from his bankruptcy will, in and of itself, constitute an Event of Default under this Note.

Upon the occurrence of an Event of Default, the entire balance outstanding hereunder shall, at the option of the holder hereof, become forthwith due and payable, without presentment, notice, protest or demand of any kind (all of which are expressly waived by the undersigned) for the payment of the whole or any part hereof.  Failure at any time to exercise any of the aforesaid options or any other rights of Lender hereunder shall not constitute a waiver thereof, nor shall it be a bar to exercise of any of the aforesaid options or rights at a later date.

As used herein, the term "Lender" shall include Lender and Lender's successors, endorsees and assigns.

ALMOND INTERNATIONAL, INC.

By: _____

Name: JONATHAN MANDELBAUM

Title: CHAIRMAN

ALMOND STERLING, INC.

By: _____

Name: MAURICE MANDELBAUM

Title: PRESIDENT

ALMOND (THAILAND) LIMITED

By: _____

Name: MAURICE MANDELBAUM

Title: DIRECTOR

GOLD AND HONEY (1995) LP

By Ango Jewels, Inc.

By: _____

Name: JONATHAN MANDELBAUM

Title: PARTNER President

GOLD & HONEY, LTD.

By: _____

Name: JONATHAN MANDELBAUM

Title: CHAIRMAN

# EXHIBIT C

**COPY**

# PERSONAL LOAN NOTE

US $2,000,000                                                          August 30, 1999

   FOR VALUE RECEIVED, the undersigned, jointly and severally, unconditionally promise to pay to Stern/Leach Company ("Lender"), or order, the principal sum of TWO MILLION UNITED STATES DOLLARS (US $2,000,000), together with interest thereon at the fluctuating prime rate per annum, as reported from time to time by <u>The Wall Street Journal</u>, from the date hereof until this Note is paid in full. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in an Agreement for Strategic Alliance of even date hereof (the "Agreement") among Almond International, Inc.; Gold and Honey (1995) LP; Almond (Thailand) Limited; Almond Sterling, Inc.; Gold & Honey Ltd. (collectively the "Companies"); the shareholders and partners of the Companies; and Lender.

   The entire principal balance of this Note (together with all interest accrued thereon) shall be paid in one lump sum on the Personal Loan Maturity Date.

   This Note is secured by a collateral assignment of the Key Man Life Insurance Policies (as defined in the Agreement) and by a pledge of shares and partnership interests in the Companies.

   This Note may be prepaid in whole or in part at any time and from time to time without premium or penalty. This Note is subject to the mandatory prepayment or discharge thereof as and to the extent provided for in Sections 1.6, 1.8 and 1.9 of the Agreement and must be prepaid upon the death of either of Jonathan Mandelbaum or Maurice Mandelbaum to the extent of any death benefit received by any of the undersigned pursuant to any of the Key Man Life Insurance Policies (as defined in the Agreement).

   This Note is not subject to set off for any amounts for any reason.

   The undersigned, jointly and severally, for themselves and their successors and assigns, hereby expressly waive presentment, demand, notice of demand, protest, notice of protest and notice of nonpayment and any other notice required to be given under the law to the undersigned in connection with the delivery, acceptance, performance, default or enforcement of this Note. The undersigned, jointly and severally, further agree to pay, on demand, all costs and expenses of collection of this Note, including, without limitation, reasonable attorneys fees, subject to Section 1.12 of the Agreement.

   Any of the following shall constitute an Event of Default under this Note: (i) failure on the part of the undersigned to pay any installment of principal or interest under this Note as and when due; (ii) any breach or default in the payment or performance of any obligations, liabilities or agreements of the Companies (or the

shareholders and partners thereof) to Lender or any of Lender's affiliates under the Agreement, or the breach of any of the representations and warranties made by the Companies (or the shareholders and partners thereof) in the Agreement; (iii) the filing or commencement of a proceeding against any of the Companies for dissolution or liquidation (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof) or the voluntary or involuntary termination or dissolution of any of the Companies; (iv) any of the Companies is enjoined, restrained or in any way prevented by court order from conducting all or a material portion of its business affairs; (v) any of the Companies or undersigned becomes insolvent or the subject of any bankruptcy or similar proceeding (but, in the case of an involuntary proceeding, only if not dismissed within 90 days of the commencement thereof), or the business failure of, the appointment of (or taking possession by) a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official for (or for any of the property of) any of the Companies or undersigned or an assignment for the benefit of creditors by the Companies or undersigned or failure by any of the Companies or undersigned generally to pay its debts as and when due; (vi) any of the Companies suffers or permits any event or condition, whether or not occurring in the ordinary course of business, which event or condition by itself or in conjunction with any or all other such events or conditions, has or will have a material adverse effect on the condition (financial or otherwise), properties, assets, liabilities, business, operations, affairs or prospects of the Companies; or (vii) any of the Companies furnishes to Lender financial statements which are required to be furnished to Lender pursuant to Section 2.1 (d) of the Agreement and which are accompanied by a qualified opinion of the auditors for the Companies. Notwithstanding the foregoing: (A) a breach or default under any of clauses (a) through (g) or (l), (m) or (q) of Section 2.1 of the Agreement which is the first of its kind to occur in any 12 consecutive month period shall not constitute an Event of Default hereunder unless such breach or default remains uncured 30 days after written notice thereof is given by Lender to the Owners' Representative, (B) a breach of the representations and warranties made by the Companies (or the shareholders and partners thereof) in Sections 4.2 (second sentence) and 4.7 of the Agreement or in Exhibit H (Sections 1 through 30 thereof) of the Agreement shall not constitute an Event of Default under this Note unless such breach is material, (C) a breach by the Companies of their obligations under Section 3.2 of the Agreement shall not constitute an Event of Default under this Note unless a breach thereof occurs in connection with more than 15% of all Products sold by the Companies to Lender in any calendar quarter or more than 15% of all Products sold by the Companies to Lender in any calendar year and (D)  a breach by the Companies of their obligations under Section 3.1 of the Agreement shall not constitute an Event of Default under this Note unless the Companies fail to fill more than 15% of Lender's orders which are required to be filled under Section 3.1 in any calendar year.

Upon the occurrence of an Event of Default, the entire balance outstanding hereunder shall, at the option of the holder hereof, become forthwith due and payable, without presentment, notice, protest or demand of any kind (all of which are expressly waived by the undersigned) for the payment of the whole or any part hereof.  Failure at

any time to exercise any of the aforesaid options or any other rights of Lender hereunder shall not constitute a waiver thereof, nor shall it be a bar to exercise of any of the aforesaid options or rights at a later date.

As used herein, the term "Lender" shall include Lender and Lender's successors, endorsees and assigns.

_____
Jonathan Mandelbaum

_____
Maurice Mandelbaum

*f:\apsdocs\docsam\cookeng\hoops\persloan.doc*

# EXHIBIT D

# PERSONAL GUARANTY

COPY

Reference is made to an Agreement for Strategic Alliance of even date hereof (the "Agreement") among Almond International, Inc.; Almond Sterling, Inc.; Gold and Honey (1995) LP; Gold & Honey, Ltd.; and Almond (Thailand) Limited (collectively the "Companies"); the shareholders and partners of the Companies; and Stern/Leach Company (the "Lender"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Agreement.

For value received, and in order to induce Lender to enter into the Agreement, each of the undersigned, jointly and severally (each a "Guarantor" and collectively "Guarantors"), for himself and his executors, administrators, legal representatives, heirs and assigns, hereby guarantees prompt payment and performance to Lender, its successors and assigns, of all of the obligations of the Companies under the New Loan Note, the Trade Debt Note and the Second New Loan Note (the "Obligations") as and when the same are due and payable or to be performed. Guarantor agrees to the provisions of the New Loan Note, the Trade Debt Note and the Second New Loan Note; waives demand, presentment, protest, notice of any kind and all suretyship defenses generally; agrees that (1) any renewal, extension or postponement of the time of payment or performance or any other indulgence, (2) any modification, supplement or alteration of any of the Obligations (or security therefor), and (3) any addition or release of any person or entity primarily or secondarily liable, may be effected without notice to and without releasing Guarantor; agrees that the liability of Guarantor hereunder is primary, direct and unconditional and may be enforced without requiring Lender first to resort to any other person (including, without limitation, the Companies or any of them), right, remedy or collateral; and subject to Section 1.12 of the Agreement, agrees to pay any and all expenses paid or incurred by Lender (including, without limitation, reasonable attorney's fees) in connection with the collection or enforcement of the Obligations or this Guaranty.

Notwithstanding any other provision of this guaranty, the aggregate monetary liability of Guarantors hereunder shall not exceed US$4,025,000.

This Guaranty is executed under seal by each Guarantor on this 30th day of August, 1999.

_____
Jonathan Mandelbaum

_____
Maurice Mandelbaum

f:\apsdocs\docsam\cookeng\hoops\persgrnt.doc

# EXHIBIT E

January 29, 2003

Jonathan Mandelbaum
Maurice Mandelbaum
c/o Almond International, Inc.
17 Barstow Road, Suite 206
Great Neck, NY 11021

Re:   <u>(1) The Agreement for Strategic Alliance dated August 30, 1999 (the "Hoops Agreement"); and (2) the Agreement dated as of October 3, 2000 (the "Thailand Agreement")</u>

Dear Jonathan and Maurice:

1.     Capitalized terms used in this letter and not otherwise defined in this letter will have the meanings given to such terms in the Hoops Agreement.

2.     (a)  Subject to and upon Lender's receipt of the payments aggregating $2,000,000 required to be made to Lender under Section 3 hereof, the Notes shall be, and they hereby are, amended to provide that the combined outstanding balances of principal and accrued interest thereon (as specified in the attached list) (totaling $6,500,000) will be repaid in accordance with the new repayment schedule attached hereto as <u>Exhibit A</u>, together with interest thereon from January 1, 2003 until the Notes are paid in full, at the fluctuating Prime Rate per annum as reported from time to time by <u>The Wall Street Journal</u> plus one percent (1%). Interest will be payable contemporaneously with each payment of principal. With the exception of the new repayment schedule, all of the other original terms and conditions of the Notes will continue to apply and are hereby confirmed.

(b)  The parties acknowledge and agree that:

(A) if on or before December 31, 2006 both (i) the Notes are paid in full (after giving effect to the discount hereinafter referred to) and (ii) you redeliver to Lender or its designee, in accordance with Lender's instructions for delivery, or pay to Lender the then fair

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 2

market value of, all ounces of gold then (at the time the Notes are paid in full) on consignment from Lender to the Companies or any of their or your affiliates, then the outstanding principal balance of the amended Notes shall be discounted and deemed automatically discharged to the extent of $1,500,000, provided that if the then outstanding principal balance of the Notes is less than $1,500,000, the amount of the shortfall shall be credited against your redelivery/purchase obligation in respect of the consigned gold. For purposes of this paragraph 2(b) only, all Stern Property (as defined in the Thailand Agreement) shall be considered to be "on consignment" from Lender to the Companies and must be purchased as if it were consigned gold if the discount is to be earned; and

(B) if on or before December 31, 2008 both (i) the Notes are paid in full (after giving effect to the discount hereinafter referred to) and (ii) you redeliver to Lender or its designee, in accordance with Lender's instructions for delivery, or pay to Lender the then fair market value of, all ounces of gold then (at the time the Notes are paid in full) on consignment from Lender to the Companies or any of their or your affiliates, then the outstanding principal balance of the amended Notes shall be discounted and deemed automatically discharged to the extent of $1,000,000, provided that if the then outstanding principal balance of the Notes is less than $1,000,000, the amount of the shortfall shall be credited against your redelivery/purchase obligation in respect of the consigned gold. For purposes of this paragraph 2(b) only, all Stern Property (as defined in the Thailand Agreement) shall be considered to be "on consignment" from Lender to the Companies and must be purchased as if it were consigned gold if the discount is to be earned.

(c) The parties further agree that, at the request of Lender, the Companies will provide labor/fabrication services for those orders placed by Lender with the Companies that are listed on Exhibit B attached hereto and that, once such labor/fabrication services have been rendered, then in lieu of the charges that would otherwise normally be paid by Lender therefor, the combined outstanding principal balances of the Notes shall be deemed to be automatically paid and discharged to

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 3

the extent of the value of such services, it being understood that, for this purpose, the value of such services shall be consistent with the charges therefor currently being paid by Lender to the Companies. With respect to those orders placed by Lender which are covered by the immediately preceding sentence, the Companies acknowledge and agree that Lender will not advance the gold for fulfillment of such orders; rather the Companies will procure such gold, and the Lender will "replace" such gold for fulfillment of further Lender orders once the finished product containing same has been received by Lender in Attleboro, Massachusetts.

(d)  Commencing with calendar year 2003, and for each succeeding calendar year until the Notes are paid in full, any Excess Cash (as defined below) shall be paid by the Companies to the Lender, in prepayment of the Notes, within ninety (90) days after the end of such calendar year.

"Excess Cash" shall mean 50% of the excess over $500,000 of the Combined Annual Net Income of The Almond Group PLUS (i)  50% of depreciation expense for the year deducted in computing Net Income and, SUBTRACT (i) Repayments of indebtedness paid in such calendar year and (ii) amortization of non-cash income (example, royalty income) included in the computation of Net Income.

For the purpose of this Paragraph the Almond Group consists of:

>
> Almond International Inc.
> Almond Sterling Inc.  (inactive)
> Gold & Honey (1995) L.P.
> Almond (Thailand) Ltd.
> Sri-Manora Co., Ltd. (SMC)

(e)  Any and all payments, prepayment or deemed discharges of the Notes occurring after the date hereof shall be applied among the New Loan Note, the Trade Debt Note and the Personal Loan Note as you shall designate in advance of payment or discharge or, in default of your timely designation, ratably among the Notes; and any payment, prepayment or deemed discharge against any Note shall be applied against regularly scheduled installments of principal in the inverse order of their maturity.

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 4

     3.     Upon execution of this Agreement, you will immediately cause the
Partnership to purchase, by wire transferring or causing to be wire transferred to
Lender a purchase price equal to $1,400,000, a portion of the gold now on
consignment from Lender to you and/or the Companies which, when expressed as a
number of fine troy ounces, would have a fair market value, based upon the pm
London fix immediately following Lender's receipt of said $1,400,000 in good
funds, equal to $1,400,000. Upon Lender's receipt of said $1,400,000 and subject
to Lender's receipt of evidence, reasonably satisfactory to Lender, that Mocatta has
advanced at least $600,000 worth of gold to the Partnership, Lender will wire
transfer to the Partnership approximately $623,000 against outstanding labor
invoices. Immediately upon the Partnership's receipt of said $623,000, you will
immediately cause the Partnership to also purchase, by wire transferring to Lender
an additional purchase price equal to $600,000, an additional portion of the gold
now on consignment from Lender to you and/or the Companies which, when
expressed as a number of fine troy ounces, would have a fair market value, based
upon the pm London fix immediately following Lender's receipt of said $600,000
in good funds, equal to $600,000. The aggregate number of ounces of gold
purchased by the Partnership from Lender under this Section 3 hereof (whether
$1,400,000 or $2,000,000 worth) is hereinafter referred to as the Purchased Gold.

As collateral security for payment of the Notes, you and the Companies (including
but not limited to the Partnership) hereby grant to Lender a first priority security
interest in the Purchased Gold and agree to execute, deliver and file such
agreements and instruments as Lender may request in order to create and perfect
said security interest (or the equivalent thereof recognized under the laws of any
foreign jurisdiction) or as may be necessary to ensure that Lender's rights in the
Stern Property (as defined in the Thailand Agreement) take priority over the rights
of any other person. Upon any event of default under the Hoops Agreement (as
amended herein), the Notes or the Thailand Agreement, then, at Lender's election,
and in addition to and without limitation of any other rights and remedies available
to Lender, Lender may enforce its security interest, or the equivalent thereof, to the
maximum extent allowed by law.

Subject to and upon Lender's receipt of the aggregate purchase price for the
Purchased Gold, and after giving effect to the purchase of the Purchased Gold, the

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 5

number of ounces of gold on consignment from Lender to you and/or the
Companies (plus all ounces of gold content of the Stern Property) upon which,
from and after the date hereof, you and/or the Companies will continue to pay
consignment fees at rates consistent with our past practice, shall be the difference
between (A) 10,094 and (B) the number of ounces included within the Purchased
Gold.

     4.     Subject to and effective upon Lender's receipt of payments for
Purchased Gold aggregating $2,000,000, Lender hereby permanently revokes the
exercise of Lender's First Option.

     5.     Except as expressly and specifically modified by this letter, all of
the terms and provisions of the Hoops Agreement and the Notes and other
agreements entered into contemporaneously therewith are hereby ratified and
confirmed, including, but not limited to: (i) the pledge contained in Section 1.10 of
the Hoops Agreement, (ii) the affirmative and negative covenants contained in
Sections 2.1 and 2.2 of the Hoops Agreement, (iii) the provisions of Article III
regarding Supply Agreement and Consignment of Precious Metals; (iv) the New
Loan Note, the Trade Debt Note and the Personal Loan Note, and (v) the Guaranty
of Jonathan Mandelbaum and Maurice Mandelbaum. In addition, all of the terms
and provisions of the Thailand Agreement are hereby ratified and confirmed.
Nothing herein shall impair Lender's rights in Stern Property (as defined in the
Thailand Agreement) or any of Lender's rights and remedies under the Thailand
Agreement.

Notwithstanding the above:

     Clause (B) of Subsection (d) of Section 2.1 of the Hoops Agreement shall
be replaced with the following: "furnish to Lender and Lender's auditors within
ninety (90) days of the end of fiscal year 2002 and each subsequent fiscal year,
audited financial statements of the Company except that the financial statements
thus furnished for Almond International and Almond Sterling shall be prepared on
a review basis. Each such financial statement shall be accompanied by the opinion
of its preparer that it presents fairly the financial position of the Company and the
result of its operations and changes in cash flow as of and for the period then

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 6

ended, or that such statements were prepared on a review basis when applicable; and";

Subsections (i) and (n) of Section 2.1 of the Hoops Agreement are hereby terminated and shall no longer apply between the parties thereto; and

From and after the date hereof, subsections (d), (e), (g), (p), (s), (t), (u) and (x) of Section 2.2 of the Hoops Agreement shall read as set forth on Exhibit C attached hereto.

In addition, from and after the date hereof, for purposes of the affirmative and negative covenants contained in Sections 2.1 and 2.2 of the Hoops Agreement, the term "Company" shall also include Sri-Manora Co. Ltd. ("SMC") in addition to the five original Companies. Furthermore, you agree, whenever requested by Lender, to effectuate a pledge of one half of the equity of SMC as additional security for the Notes and otherwise consistent with the pledge of Section 1.10 of the Hoops Agreement.

6.    You hereby represent to Lender that your execution, delivery and performance of this Agreement do not violate the terms and provisions of any agreement to which you or any of the Companies are a party.

7.    We kindly request that you provide us with your updated personal financial statements within ninety (90) days of the date of this letter.

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 7

If the foregoing is agreeable to you, we would appreciate it if you would
countersign this letter below.

STERN/LEACH COMPANY

By: _____  1/29/03
     Richard H. Smith, President

ACCEPTED AND AGREED:

_____
Jonathan Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement

_____
Maurice Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement

*241749_4.doc*

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2003
Page 7


If the foregoing is agreeable to you, we would appreciate it if you would
countersign this letter below.

STERN/LEACH COMPANY


By: _____
            Richard H. Smith, President


ACCEPTED AND AGREED:


_____
Jonathan Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement


_____
Maurice Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement


*246769_1.doc*

TOTAL P.02

Jonathan Mandelbaum
Maurice Mandelbaum
January 29, 2002
Page 7

If the foregoing is agreeable to you, we would appreciate it if you would
countersign this letter below.

STERN/LEACH COMPANY

By: _____
    Richard H. Smith, President

ACCEPTED AND AGREED:

_____
Jonathan Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement

_____
Maurice Mandelbaum, individually
and on behalf of the Companies
and all other parties (other than
Lender) to the Hoops Agreement
and the Thailand Agreement

s4777.1.doc

Steve / Josh

**Exhibit A**

Debt Summary and Repayment Schedule

(000's)

Debt Summary

### Money Obligation

| | |
|---|---|
| Trade Note | $3,300 |
| New Loan | $700 |
| Personal Loan | $2,000 |
| Est Accrued Interest | $500 |
| | |
| Total Money Debt | $6,500 |

### Repayment in Four Years

| | |
|---|---|
| Money Debt | $6,500 |
| | |
| Payment 2003 | ($720) |
| Payment 2004 | ($720) |
| Payment 2005 | ($1,760) |
| | |
| Sub Total | $3,300 |
| | |
| Discount * | ($1,500) |
| | |
| Payment 2006 | $1,800 |

### Repayment in Six Years

| | |
|---|---|
| Money Debt | $6,500 |
| | |
| Payment 2003 | ($720) |
| Payment 2004 | ($720) |
| Payment 2005 | ($1,760) |
| Payment 2006 | ($1,200) |
| Payment 2007 | ($1,200) |
| | |
| Sub Total | $900 |
| | |
| Discount * | ($1,000) |
| | |
| Payment 2008 | ($100) |

Note: Money debt will accrue interest at the prime rate plus 1% commencing
      commencing 1/1/03 and will be paid monthly before any principle amount.

      Principle debt payments will be monthly.

*  only if all consigned metal redelivered or paid for when Notes are paid in full

246632 (Excel)